# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ACADIANA MANAGEMENT GROUP, LLC, | ) | Case No. 17-50799 |
| et al. | ) | |
| | ) | Jointly Administered |
| Debtors.[1] | ) | |

IMMATERIALLY MODIFIED FOURTH AMENDED DISCLOSURE STATEMENT RELATING TO FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR ACADIANA MANAGEMENT GROUP, LLC, ET AL.

THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

Dated: January 11, 2018

GOLD, WEEMS, BRUSER, SUES & RUNDELL
BRADLEY L. DRELL (Bar Roll #24387)
Heather M. Mathews (Bar Roll #29967)
B. Gene Taylor, III (Bar Roll #33407)
Chelsea M. Tanner (Bar Roll #37890)
P.O. Box 6118
Alexandria, LA 71307-6118
Telephone: (318) 445-6471
Facsimile: (318) 445-6476
E-mail: bdrell@goldweems.com
Counsel to the Debtors

---

[1] AMG Hospital Company, L.L.C., Case No. 17-50800; AMG Hospital Company II, L.L.C., Case No. 17-50801; Albuquerque-AMG Specialty Hospital, L.L.C., Case No. 17-50802; Central Indiana-AMG Specialty Hospital, L.L.C., Case No. 17-50803; Tulsa-AMG Specialty Hospital, L.L.C., Case No. 17-50804; LTAC Hospital of Louisiana-Denham Springs, L.L.C., Case No. 17-50805; Las Vegas-AMG Specialty Hospital, L.L.C., Case No. 17-50806; LTAC Hospital of Greenwood, L.L.C., Case No. 17-50807; LTAC of Louisiana, L.L.C., Case No. 17-50808; Houma-AMG Specialty Hospital, L.L.C., Case No. 17-50809; LTAC Hospital of Edmond, L.L.C., Case No. 17-50810; LTAC Hospital of Wichita, L.L.C., Case No. 17-50811; AMG Realty I, L.L.C., Case No. 17-50812; CHFG Albuquerque, L.L.C., Case No. 17-50813; and AMG Realty Youngsville, L.L.C., Case No. 17-50814.

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................... 1

II.  NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ............ 2

III. EXPLANATION OF CHAPTER 11 ....................................................................... 4

    A.   Overview of Chapter 11 ............................................................................ 4

    B.   Chapter 11 Plan ........................................................................................ 5

    C.   Confirmation of a Chapter 11 Plan ........................................................... 6

IV.  OVERVIEW OF THE PLAN ................................................................................. 6

    A.   Summary of the Terms of the Plan ............................................................ 7

    B.   Voting Rights Under the Plan .................................................................... 9

V.   GENERAL INFORMATION ................................................................................ 10

    A.   Organizational Structure and Management .............................................. 11

    B.   Employees ............................................................................................... 12

    C.   Pre-petition Capital Structure ................................................................. 12

    D.   Factors That Precipitated the Debtors' Chapter 11 Filing And Purpose Thereof.... 14

VI.  THE CHAPTER 11 CASES .............................................................................. 15

    A.   Filing of the Petitions and Debtor in Possession Status ............................ 15

    B.   First Day Pleadings and Orders .............................................................. 15

    C.   Employment of Professionals for the Debtors ......................................... 15

    D.   Appointment of the Committee. .............................................................. 15

    E.   Use of Cash Collateral. .......................................................................... 16

    F.   DIP Financing......................................................................................... 16

    G.   Closure or Sale of Certain Hospitals Post-Bankruptcy……………………....16

    H.   Marketing of the Debtors' Hospitals For Sale…………………………………17

    I.   Value of the Assets……………………………………………………………...17

    J.   Exclusivity ............................................................................................. 17

    K.   Claims Bar Date ..................................................................................... 18

    L.   Administrative Claim Bar Date ............................................................... 18

    M.   Payment of Administrative Expense Claims ............................................ 18

ii

VII.    POTENTIAL LITIGATION ............................................................. 19

    A.    Retained Estate Causes of Action. ........................................ 19

    B.    Releases of Causes of Action Against Management ............................... 21

    C.    Pending Litigation.......................................................... 25

VIII.  THE CHAPTER 11 PLAN............................................................ 25

    A.    Substantive Consolidation................................................... 25

    B.    Treatment of Claims Against and Equity Interests in the Debtors. ........................ 28

    C.    Estimated Distributions to General Unsecured Creditors...................................... 31

    D.    Sources of Cash for Plan Distributions...................................32

    E.    The Liquidation Trust .......................................................33

    F.    Limitation of Liability…………………………………………………………………………36

IX.    CONFIRMATION AND CONSUMMATION PROCEDURES ....................................... 37

    A.    Overview................................................................ 37

    B.    Confirmation of the Plan..................................................... 38

    C.    Cramdown................................................................ 41

    D.    Effect of Confirmation ..................................................... 42

X.    TAX ISSUES ....................................................................... 43

XI.    RISK FACTORS..................................................................... 44

    A.    Certain Bankruptcy Considerations ....................................... 44

    B.    Certain Tax Considerations.................................................. 46

XII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ..... 46

XIII.  CONCLUSION .................................................................. 46

## EXHIBITS

Plan Term Sheet and Support Agreement ............................................................. Exhibit "A"

Fourth Amended Chapter 11 Plan of Reorganization ........................................... Exhibit "B"

Disclosure Statement Order .................................................................................. Exhibit "C"

List of Ownership Interests...................................................................................... Exhibit "D"

Enterprise Valuation by Stout................................................................................. Exhibit "E"

## SCHEDULES

Chapter 7 Liquidation Analysis ....................................................................... Schedule I

NewCo Cash Flow Projection......................................................................... Schedule II

LTAC of Feliciana, LLC Balance Sheet.......................................................... Schedule III

Estimated Administrative Expense claims....................................................... Schedule IV

Estimated Value of Accounts Receivable........................................................ Schedule V

Estimated Amount of Lease Rejection Claims................................................. Schedule VI

Estimated Unsecured Claims.......................................................................... Schedule VII

Estimated Claims Participating in the Liquidation Trust……………………..…Schedule VIII

# I.
## INTRODUCTION

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan (see, e.g., Article I, Section 1.1 of the Plan). Unless otherwise stated, all references herein to "Schedules" and "Exhibits" are references to schedules and exhibits to this Disclosure Statement, respectively.

BY ORDER DATED _____, 2018 (THE "DISCLOSURE STATEMENT ORDER"), THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF LOUISIANA (THE "BANKRUPTCY COURT") APPROVED THE DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") RELATING TO THE JOINT CHAPTER 11 PLAN OF ORDERLY LIQUIDATION FOR PROGRESSIVE ACUTE CARE, LLC, ET AL. (THE "PLAN").

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT "A", FILED BY ACADIANA MANAGEMENT GROUP, LLC ("AMG") AND ITS AFFILIATED DEBTORS (COLLECTIVELY, THE "DEBTORS"). OTHER THAN CLASS 1 – PRIORITY NON-TAX CLAIMS AGAINST THE DEBTORS, WHICH IS UNIMPAIRED UNDER THE PLAN AND IS THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN, AND CLASS 7, WHICH ARE NOT ENTITLED TO A DISTRIBUTION UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE REJECTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS IN CLASSES 2, 3, 4A, 4B, 5, 6A and 6B.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY __:__ __.M., PREVAILING CENTRAL TIME, ON _____,2018 (THE "VOTING DEADLINE"). FOR THE AVOIDANCE OF DOUBT, THE DEBTORS RESERVE THE RIGHT TO OBJECT TO CLAIMS AFTER THE VOTING DEADLINE. MOREOVER, FOR THE AVOIDANCE OF DOUBT, IT IS POSSIBLE THAT HOLDERS OF CLAIMS, INCLUDING UNSECURED CLAIMS THAT DO NOT APPEAR ON THE DEBTORS' SCHEDULES AND ARE NOT ALLOWED CLAIMS, WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIMS UNTIL THE EXPIRATION OF THE TIME PERIOD WITHIN WHICH CLAIM OBJECTIONS MUST BE FILED AS REFERENCED IN THE PLAN.

1

## II.
## NOTICE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim or Equity Interest is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. DELIVERY OF THIS DISCLOSURE STATEMENT AFTER THE DATE HEREOF DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN INFORMATION SET FORTH HEREIN SINCE THAT DATE. THE DEBTORS HAVE NO DUTY TO, AND EXPRESSLY DISCLAIM ANY OBLIGATION TO, UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, UNLESS OTHERWISE ORDERED TO DO SO BY THE BANKRUPTCY COURT. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY FINANCIAL INFORMATION, ILLUSTRATIVE CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED, AT

2

LEAST IN PART, ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. MOREOVER, THE DEBTORS RESERVE ALL OF THEIR RESPECTIVE RIGHTS TO ASSERT THAT THE ALLOCATION OF VALUE MAY BE DIFFERENT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS IN THESE CHAPTER 11 CASES.

On _____, 2018, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order pursuant to section 1125 of the Bankruptcy Code, finding that the Disclosure Statement contains information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of holders of the solicited classes of Claims against the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and certain of the Professional Persons the Debtors have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Debtors. You should not rely on any information relating to the Debtors, their businesses, or the Plan other than that contained in this Disclosure Statement, the exhibits hereto, and the Plan itself.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot (the "Ballot") and return the same to the address set forth on the Ballot, in the enclosed, postage prepaid, return envelope so that it will be actually received by the Debtors' counsel, Gold, Weems, Bruser, Sues & Rundell, P.O. Box 6118, Alexandria, Louisiana 71307, Attn: Bradley L. Drell, no later than the Voting Deadline. All votes to accept or reject the Plan

must be cast by using the appropriate ballot. Votes which are cast in any other manner will not be counted. All ballots must be actually received by the Debtors' counsel no later than _____, 2018 at ___:__ _.m., prevailing Central Time. For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order attached hereto as Exhibit "C".

DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

THE PLAN CONTAINS BROAD RELEASES AND INJUNCTIONS THAT WILL AFFECT YOUR RIGHTS AS DESCRIBED IN SECTION VIII (D) OF THIS DISCLOSURE STATEMENT AND ARTICLE VIII OF THE PLAN. THESE RELEASES AND INJUNCTIONS INCLUDE, AMONG OTHERS: (I) A PERMANENT INJUNCTION OF THE COMMENCEMENT OF ACTIONS AND THE PERFECTION OR ENFORCEMENT OF JUDGMENTS AND ENCUMBRANCES AGAINST THE DEBTORS AND THEIR ESTATES BY ANY ENTITY; (II) A RELEASE OF CERTAIN PARTIES" WITH RESPECT TO, AMONG OTHER THINGS, THE CHAPTER 11 CASES AND THE PLAN; AND (III) A PERMANENT INJUNCTION OF ANY ACTION RELATED TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") for _____, 2018 at __: _.m., prevailing Central Time, before the Honorable Robert Summerhays, United States Bankruptcy Judge of the United States Bankruptcy Court for the Western District of Louisiana. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before _____, 2018 at __:__ _.m., prevailing Central Time, in the manner described in the Disclosure Statement Order attached hereto as Exhibit "C".

THE PLAN PROPONENTS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.

III.
EXPLANATION OF CHAPTER 11

A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its business for the benefit of its creditors, equity holders and other parties in interest. The Debtors commenced these chapter 11 cases, captioned In re Acadiana Management Group, LLC, et al., Case No. 17-50799 (the "Chapter 11 Cases"), with the filing of voluntary petitions (the "Petitions") for relief under chapter 11 of the Bankruptcy

4

Code on June 23, 2017 (the "Petition Date").

The commencement of a chapter 11 case creates an estate comprised of all the legal and equitable interests of a debtor in property as of the date the petition is filed. Sections 1101, 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. In the Chapter 11 Cases, the Debtors have remained in possession of their property and continued to operate their business as debtors in possession up to the September 1, 2016 closing on the sale of their assets to the Buyer.

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan.

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying claims against and interests in a debtor's estate. Unless a trustee is appointed, only a debtor may file a plan during the first 120 days of a chapter 11 case (the "Filing Period"), and the debtor will have 180 days to solicit acceptance of such plan (the "Solicitation Period" and, collectively with the Filing Period, the "Exclusive Periods"). However, section 1121(d) of the Bankruptcy Code permits the bankruptcy court to extend or reduce the Exclusive Periods upon a showing of "cause." The Filing Period and Solicitation Period may not be extended beyond 18 months and 20 months, respectively, from a debtor's petition date. In these Chapter 11 Cases, the Debtors filed the Plan within the applicable Filing Period, as extended, and accordingly, no other creditor or party in interest may file a plan during the Exclusive Periods.

B.    <u>Chapter 11 Plan</u>

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of the plan, the plan becomes binding on a debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. For a description of key components of the Plan, see "Overview of the Plan," below.

After a chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of impaired claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.

5

C.      Confirmation of a Chapter 11 Plan

If all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.  See "Confirmation and Consummation Procedures – Confirmation of the Plan," below.  The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan for the bankruptcy court to determine that the class has accepted the plan.  See "Confirmation and Consummation Procedures."

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan.  See "Confirmation and Consummation Procedures."  Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.

In general, a bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. See "Confirmation and Consummation Procedures – Cramdown."  The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims.

The Unsecured Creditors Committee objects to this Plan and is recommending to Class 8A Unsecured Creditors that they vote to not accept the Plan.  However, the Committee has not put forth an alternative plan, and the Debtors' Plan is the only one proposed despite the fact that the exclusivity period for the Debtors to file and confirm a plan has expired.

IV.
OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Equity Interests in each of the four Debtors in the Chapter 11 Cases.  As set forth below and in the Plan, the classes of Claims against and Equity Interests in each of the Debtors are treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.  Allowed Claims held against one Debtor will be satisfied from the Assets of all Debtors and the Estates, and each Claim against a Debtor will be treated as a Claim against the consolidated Estate of all Debtors for all purposes including, but

6

not limited to, voting and distribution; provided, however, that no Claim will receive value in excess of 100% of the Allowed amount of such Claim under the Plan.

A.    Summary of the Terms of the Plan

The Plan implements and is built around the following key elements:

- The Plan incorporates the Plan Term Sheet entered into by and among, the Debtors' Management and CHCT of Louisiana, LLC. A copy of the Plan Term Sheet is attached hereto as Exhibit A.  The key plan premise is that the Debtors' Management will create a new company ("NewCo") that will, in exchange for Management contributing a Management owned non-Debtor rehabilitation hospital located in Covington, LA, receive six Debtor operating entities constituting seven Long Term Acute Care Hospitals.   The key elements of the Plan Term Sheet, as incorporated into the Plan, include:

  o  A $1.5 million Priority Reserve for payment of administrative professional fees, and a $1.0 million Priority Reserve for other Administrative Expense claims, with any overages to be assumed by a new company formed by Management ("NewCo").   NewCo will also assume Allowed Priority Claims.

  o  BOKF's Secured Claim on its Line of Credit extended to the Operating Debtors has been purchased by CHCT of Louisiana, LLC (CHCT).   In connection with the Plan, CHCT's deficiency claim on its real estate loan and the BOKF Secured Claim will be rolled up into a new loan. CHCT will fund NewCo debt as described herein up to a total amount of $22,750,000 (the "CHCT Debt") comprised of (i) the aforementioned BOKF RLOC debt purchase at a price of up to $8,750,000, (ii) the payment of the CHCT deficiency claim of $6,700,000 (the "CHCT Deficiency Claim"), and (iii) additional incremental CHCT debt financing of $7,300,000.  The sources and uses for the exit plan financing (the "Agreed Sources and Uses") are as follows:

### AMG Exit Plan Sources and Uses

| | |
|---|---|
| CHCT Debt | 22,750,000 |
| Minimum Equity - Contribution of N. Alabama & Covington Hospitals | |
| Gus Rantz III - UCC Contribution | 250,000 |
| **Total Sources** | **23,000,000** |
| | |
| BOKF - Up to | 8,750,000 |
| CHCT | 6,700,000 |
| Administrative Expenses - Up to | 1,500,000 |
| UCC - Up to | 250,000 |

7

| | |
|---|---|
| DIP Financing - Up to | 2,000,000 |
| Repay FB&T - Up to | 2,600,000 |
| Minimum NEWCO Liquidity | 500,000 |
| Capital Lease and Equipment Notes | 700,000 |
| **Total Uses** | **23,000,000** |

The payment to FB&T above will be paid to First Bank & Trust which has general liens on the Covington Rehab and North Alabama LTAC hospitals that will be part of NewCo, to allow those assets to serve as collateral for the CHCT debt.

- o The real property assets of the real estate company Debtors' estates will be sold free and clear of liens, either (at the option of the secured creditors): (a) to the secured creditors or their designees via credit bids at a price to be mutually agreed upon; (b) to third parties for cash; or (c) otherwise as directed by the secured creditors. The Debtors estimate that BOKF will have an unsecured deficiency claim of approximately $10 million, and that CHCT of Louisiana will have an unsecured deficiency claim of $6.7 million, which will be treated in Class 6A as General Unsecured Creditors;

- o The balance of the Debtors assets will be placed in a Liquidating Trust for the benefit of Unsecured Creditors, excepting Critical Vendors who will be paid by NewCo over approximately 54 months. Additionally, the Debtors' 70.59% interest in LTAC of Feliciana, LLC, an LTAC hospital in Zachary, Louisiana, will be transferred to the liquidating trust; a balance sheet for LTAC of Feliciana is attached hereto as Schedule III;

- o The Liquidating Trust will be funded with $250,000 from Management; and

- o All present Equity Issues will be cancelled, and new equity will be issued to NewCo for the operating entities and the Alabama LTAC hospital being transferred;

- • On the Effective Date, the authority, power and incumbency of the Debtors shall terminate, and vest in the Liquidation Trustee. The Liquidation Trustee shall, among other things, (a) sell, lease, license, abandon or otherwise dispose of Liquidation Trust Assets; (b) prosecute through judgment and/or settling the Liquidation Trust Assets and any defense asserted by the Liquidation Trust in connection with any counterclaim or crossclaim asserted against the Liquidation Trust; (c) calculate and make distributions required under the Plan to be made from the Liquidation Trust Assets; (d) file all required tax returns, and paying obligations on behalf of the Liquidation Trust from the Liquidation Trust Assets; (e) otherwise administer the Liquidation Trust; (f) file quarterly reports with the Bankruptcy Court with respect to the expenditures, receipts, and distributions of the Liquidation Trust; and (g) perform such other responsibilities as may be vested in the Liquidation Trustee pursuant to the Liquidation Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions

8

of the Plan relating to the Liquidation Trust.

- On the Effective Date, the Oversight Committee shall be formed. The Oversight Committee shall advise and assist the Liquidation Trustee in the implementation and administration of the Liquidation Trust pursuant to the Liquidation Trust Agreement and the Plan. A list of the proposed members of the Oversight Committee, whose appointment shall become effective as of the Effective Date of the Plan, shall be filed with the Bankruptcy Court as a Plan Document. The Trustee and the Members of the Oversight Committee will be elected by the Unsecured Creditors Committee.

- Allowed Priority Non-Tax Claims against the Debtors are unimpaired under the Plan, and holders of such claims shall be paid in full.

- Holders of Allowed Intercompany Claims shall not receive or retain any property or rights under the Plan on account of such Claims, so as not to dilute non-insider claims.

B.    <u>Voting Rights Under the Plan</u>

The Plan creates the following classes of Claims:

| 1 | Priority Non-Tax Claims |
| 2 | BOKF Greenwood RLOC Claim |
| 3 | BOKF RLOC Claim |
| 4 | DIP Financing Claim |
| 5 | Real Estate Company Debtor Secured Claims |
| 6 | Lease Rejection Secured Claims |
| 7 | Unsecured Non-Debtor Affiliate Claims |

8        General Unsecured Claims – Class 8A is General Unsecured Creditors and Class 8B is Critical Vendors who will be paid in full over five years; these classes will vote in separate classes.

| 9 | Equity Interests |

Of those Classes, Class 1 and 2 are unimpaired and not entitled to vote on the Plan. Class 9 is conclusively deemed to reject the Plan as this class receives nothing from the Plan. Classes 3, 4, 5A, 5B, 6, 7, 8A, 8B and 9 are impaired and therefore have the right to vote for or against the Plan.

9

## V.
### GENERAL INFORMATION

Acadiana Management Group, LLC ("AMG"), founded in 1999, is a privately-owned provider of post-acute health care services which grew into a leading specialty organization, becoming a Top 5 post-acute hospital system nationally.  As of May 2017, AMG included fourteen post-acute care hospitals and over 1,700 employees.  AMG's corporate office/management company is headquartered in Lafayette, Louisiana.

AMG's long-term acute care hospitals ("LTACs" or "LTACHs") provide a continued acute level of care for patients suffering complex medical conditions, such as respiratory failure, ventilator dependence, complicated infections, chronic non-healing wounds, cardiac complications and surgical complications. AMG's inpatient rehabilitation facilities provide intensive physical rehabilitation to patients who have suffered traumatic injury.

In this endeavor, AMG is presently affiliated with several real estate holding companies: AMG Realty I, LLC, CHFG Albuquerque, LLC, and AMG Realty Youngsville, LLC ("Real Estate Affiliates").

AMG is also affiliated with multiple hospital operating companies, including Albuquerque - AMG Specialty Hospital, LLC, Central Indiana - AMG Specialty Hospital, LLC, Tulsa - AMG Specialty Hospital, LLC, LTAC Hospital of Louisiana - Denham Springs, LLC, Las Vegas - AMG Specialty Hospital, LLC, LTAC Hospital of Greenwood, LLC, LTAC of Louisiana, LLC, Houma - AMG Specialty Hospital, LLC, LTAC Hospital of Edmond, LLC, and LTAC Hospital of Wichita, LLC ("Operating Company Affiliates").  AMG additionally affiliates with two operating entity holding companies: AMG Hospital Company, LLC and AMG Hospital Company II, LLC ("Holding Company Affiliates").

AMG and its affiliates generally own and operate LTACs and associated real estate for some of the hospitals across the United States.  The Operating Company Affiliates operate LTAC hospitals in eleven (11) locations: Wichita, KS, Edmond, OK, Oklahoma City, OK, Tulsa, OK, Albuquerque, NM, Las Vegas, NV, Lafayette, LA, West Greenfield, IN, Muncie, IN, Houma, LA and Denham Springs, LA.   Central Indiana - AMG Specialty Hospital, LLC operates the West Greenfield and Muncie, IN hospitals.  LTAC Hospital of Edmond, LLC operates the hospitals in Edmond and Oklahoma City, OK.

AMG provides management, billing, compliance, legal, financial, and accounting services to its affiliates, and derives income from the provision of those services.

As a management company, AMG also provides services to and derives income from two additional rehabilitation hospitals (Lafayette Physical Rehabilitation Hospital, LLC and Covington-AMG Rehabilitation Hospital, LLC), and two additional LTACs (LTAC Hospital of Feliciana, LLC, North Alabama – AMG Specialty Hospital, LLC) (collectively "Other Affiliates").  The Other Affiliates are not included in the Chapter 11 cases.

A.  <u>Organizational Structure and Management</u>

AMG is a Louisiana limited liability company, owned equally by August Rantz, IV, and Timothy W. Howard.  Rantz IV Enterprises (owned by August Rantz, IV) and Timothy W. Howard equally own most of the interests in each of the legal entities comprising AMG. However, certain facilities do have minority and non-controlling partners. A list of the current membership interests of AMG and all its debtor-affiliates is set forth in Exhibit D hereto.

Prior to filing, certain AMG Real Estate Affiliates and Holding Company Affiliates were merged and consolidated to reduce the number of Chapter 11 cases that would need to be filed. The mergers, however, preserve the ultimate ownership and debt structure that existed pre-petition.

To briefly describe the mergers, CHFG Edmond, LLC, CHFG Wichita, LLC, CHFG Denham Springs, LLC, CHFG/HPCG Real Estate I, LLC, and CFG Healthcare Properties, LLC were all merged into AMG Realty I, LLC, as these were all wholly-owned subsidiaries. These wholly-owned  subsidiaries were party to a Bank of Oklahoma ("BOK") real estate loan (the "real estate loan").

CHFG Albuquerque, LLC, was also party to the real estate loan.  However, CHFG Albuquerque, LLC, was not merged into AMG Realty I, LLC, due to the likelihood of a sale of the hospital property given its pre-petition state of maintenance.

AMG Realty Youngsville, LLC, was not merged into any other entity, as it was not a subsidiary of any other company.  Additionally, the real property which it owns stands for the debt owed to CHCT of Louisiana, LLC and not BOK and the syndicated lenders who hold mortgages on various debtor properties described below.

R&H Holdings of Texas, LLC, R&H Holdings of New Mexico, LLC, R&H of Houma, LLC, and R&H of Midwest, LLC, were all "stand-alone" holding companies merged into AMG Hospital Company, LLC.  Prior to the merger, Houma-AMG Specialty Hospital, LLC (wholly-owned subsidiary of R&H of Houma, LLC), LTAC Hospital of Edmond, LLC (wholly-owned subsidiary of R&H of Midwest, LLC), and LTAC Hospital of Wichita, LLC (wholly-owned subsidiary of R&H of Midwest, LLC), had received a revolving, operating line of credit from BOK (the "operating line of credit").  AMG Hospital Company, LLC, with whom these holding companies merged, was a guarantor on the operating line of credit, along with these holding companies.

LTAC Hospital of Greenwood, LLC (majority-owned by R&H Holdings of Texas, LLC) received a separate operating line of credit from BOK (the "Green wood line of credit").  AMG Hospital Company, LLC, with whom R&H Holdings of Texas, LLC, merged was a guarantor on the Greenwood line of credit, along with R&H Holdings of Texas, LLC.

R&H of Indiana, LLC, R&H Holdings of Louisiana, LLC, R&H Holdings of Tulsa, LLC and AMG Hospital Company III, LLC were merged into AMG Hospital Company II, LLC. AMG Hospital Company II, LLC, and AMG Hospital Company III, LLC were guarantors on

the CHCT loan, the operating line of credit, and Greenwood line of credit. R&H of Indiana, LLC, R&H Holdings of Louisiana, LLC, and R&H Holdings of Tulsa, LLC were also guarantors on the operating line of credit.

In many instances, the mergers reflected the mere absorption of wholly-owned subsidiaries into a master parent company. For example, the merger involving AMG Realty I, LLC, exclusively involved wholly-owned subsidiaries. The other mergers were of the same net effect, with some combination of August J. Rantz, IV, Timothy W. Howard, and Rantz IV Enterprises, L.L.C. having vast majority ownership of the affected debtor entities. Of the parties named to this proceeding, the party with the least percentage ownership by an AMG affiliate was LTAC Hospital of Greenwood, LLC, at 86.38% by the then-R&H Holdings of Texas, LLC (itself 100% owned by Rantz IV and Howard).

Accordingly, the mergers reflected, more clearly, the interrelatedness of existing ownership and debt structures. It is submitted that these mergers not only simplified the initial filing process, but also should simplify the process for creditors in these proceedings. The mergers produced absolutely no effects for trade creditors of the operating hospitals or the management company. The mergers did not adversely affect CHCT of Louisiana, LLC, or BOKF, inasmuch as the liabilities of any merged Debtors were the same for any Debtor merged on an individual basis as to these two creditors.

B.    Employees

As of November 2017, AMG and all present affiliates have 1243 employees. Considering only the entities to this proceeding, the total number of employees is 817.

C.    Pre-Petition Capital Structure

The following outlines the debt structure of the largest secured creditors of AMG, Real Estate Affiliates, and Holding Company Affiliates, after the above-described, pre-petition mergers:

A.    Bank of Oklahoma real estate loan - $26,042,763.36

    1.    Borrowers holding real property mortgaged to secure the loan:

        a.    AMG Realty I, LLC
        b.    CHFG Albuquerque, LLC

    2.    Guarantors
        a.    Acadiana Management Group, LLC
        b.    AMG Hospital Company, LLC
        c.    AMG Hospital Company II, LLC

3. Lenders
   a. BOK, NA $14,117,647.06
   b. Trustmark $10,558,235.29
   c. Eastman $2,117,647.06
   d. NBC Oklahoma $1,976,470.59

B. Bank of Oklahoma operating line of credit - $11,499,372.00 (excluding Greenwood)

   1. Borrowers granting a general security interest to secure the loan:
      a. LTAC Hospital of Edmond, LLC
      b. LTAC Hospital of Wichita, LLC
      c. Albuquerque - AMG Specialty Hospital, LLC
      d. LTAC of Louisiana - Denham Springs, LLC
      e. LTAC of Louisiana, LLC
      f. Houma - AMG Specialty Hospital, LLC
      g. Central Indiana - AMG Specialty Hospital, LLC
      h. Tulsa - AMG Specialty Hospital, LLC
      i. Las Vegas - AMG Specialty Hospital, LLC

   2. Guarantors
      a. AMG Hospital Company, LLC
      b. AMG Hospital Company II, LLC
      c. Acadiana Management Group, LLC

   3. Lenders
      a. BOK, NA $6,862,744.00
      b. Trustmark $5,147,058.00
      c. Eastman $1,029,406.00
      d. NBC Oklahoma $960,792.00

C. Bank of Oklahoma operating line of credit for LTAC Hospital of Greenwood, LLC - $594,565.64

   1. Borrower granting security interest to secure the loan:
      a. LTAC of Greenwood, LLC

   2. Guarantors
      a. AMG Hospital Company, LLC
      b. AMG Hospital Company II, LLC
      c. Acadiana Management Group, LLC
      d. AMG Realty I, LLC

   3. Lenders
      a. BOK, NA $490,196.00
      b. Trustmark $367,647.00

13

        c.       Eastman $73,529.00
        d.       NBC Oklahoma $68,628.00

D.    CHCT of Louisiana, LLC - real estate loan on Youngsville building - $10,698,149.67

    1.    Borrower granting mortgage and other security interest to secure the loan:
        a.       AMG Realty Youngsville, LLC

    2.    Guarantors
        a.       Acadiana Management Group, LLC
        b.       AMG Hospital Company, LLC
        c.       AMG Hospital Company II, LLC
        d.       LTAC of Louisiana, LLC

Finally, AMG and possibly other affiliates may be co-obligors on certain trade debts and leases incurred by the operating company affiliates.

D.    <u>Factors That Precipitated the Debtors' Chapter 11 Filing And Purpose Thereof</u>

The Debtors' financial performance was hampered by the effects of the U.S. Centers for Medicaid and Medicare Services ("CMS"), new, more stringent LTAC patient criteria, and a severe rate reduction for non-qualifying patients for receiving care at AMG LTAC hospitals. These changes went into effect for AMG and its affiliates on or about September 2016, although the enabling legislation was passed by Congress in late 2013.

To summarize these changes, for patients to qualify for the LTAC reimbursement rate of approximately $41,000 for a twenty-five (25) day patient stay, the patient must now spend at least three (3) days in a hospital's intensive care unit or a coronary care unit immediately prior to being admitted to an LTAC, or the patient must require at least 96 hours on a ventilator and have had an acute hospital stay immediately prior to being admitted to an LTAC. For non-qualifying patients, the twenty-five (25) day reimbursement rate dropped to approximately $11,000. Accordingly, with respect to many patients, these changes yielded a reduction in reimbursement by approximately 75% per patient.

To address these issues, AMG and its affiliates undertook cost-cutting and other measures to cope with the CMS reimbursement rate changes, but these measures proved to be inadequate within the structure of the long-term debt borne by AMG and its affiliates. These Chapter 11 cases have been filed to restructure that long-term debt to fit the current cash flow the Debtors now receive.

## VI.
## THE CHAPTER 11 CASES

A.   Filing of the Petitions and Debtor in Possession Status

On June 23, 2017 ("Petition date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code.  Since that time the Debtors have operated their businesses and remain in possession of their property as "debtors in possession."  Since the filing of the petitions, and by order of the Court dated August 29, 2017, substantially all assets of LTAC Hospital of Louisiana – Denham Springs, LLC, were sold free and clear of all liens and interests under 11 U.S.C. Section 363.  Moreover, the Debtors have closed facilities at the Greenwood, Tulsa and Wichita locations pursuant to business judgment and Bankruptcy Court approval.

B.   First Day Pleadings and Orders

On or about the Petition Date, the Debtors filed the following motions with the Bankruptcy Court: motion for joint administration; motion for entry of an order authorizing the Debtors to use cash collateral; motion for authority for continued use of existing business forms/records, maintenance of bank accounts and cash management system, and waiving requirements under 11 USC Section 345; motion for authority to pay obligations under prepetition insurance policies and honor terms of insurance financing agreements; motion for interim order authorizing payment of prepetition claims of critical vendors; motion authorizing payment of employee wages and compensation; and motion for order determining adequate assurance of payment for utility service providers and further restraining providers from altering, disconnection or otherwise refusing services.  Following hearing by the Bankruptcy Court on the above-referenced motions and interim and final Orders granting such motions were entered by the Bankruptcy Court shortly thereafter, as set forth more fully below.

C.   Employment of Professionals for the Debtors

Pursuant to employment applications filed with the Bankruptcy Court and subsequent orders entered by the Bankruptcy Court, the Debtors have employed, for assistance in administration of these Chapter 11 cases: (a) Gold, Weems, Bruser, Sues & Rundell, as counsel, and (b) Stout Risius Advisors, LLC and Stout Risius Ross, LLC as financial advisors.  All professionals retained by the Debtors have been, or will be, paid their allowed fees and expenses incurred on behalf of the Debtors pursuant to Orders entered by the Bankruptcy Court subject to final approval by the Bankruptcy Court.

D.   Appointment of the Committee

On July 28, 2017, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors, which originally consisted of the following members: (i) Medline Industries Inc., (ii) Accountable Health Staffing, (iii) CHCT Louisiana LLC, (iv) Rehabilitation Hospital of Acadiana LLC, and (v) Stability Biologics LLC. The Committee employed the law firm of Heller, Draper, Patrick, Horn & Dabney, LLC to serve as its bankruptcy counsel and Cohn Reznick, LLP as it financial advisors. These professionals have

15

been, or will be, paid their allowed fees and expenses incurred in the provision of their services to the Committee pursuant to Orders entered by the Bankruptcy Court subject to final approval of the Bankruptcy Court.

E.    Use of Cash Collateral

On July 12, 2017, the Bankruptcy Court entered an Order Authorizing the Interim Use of Cash Collateral and Grating Related Relief [Docket No. 90] which provided for the Debtors to use as cash collateral any revenues derived by the Debtors in the ordinary course of business and funds which are the identifiable proceeds of the Pre-Petition collateral or which are held in various bank accounts, which collateral is otherwise subject to the liens and security interests of BOKF, NA dba Bank of Oklahoma, Trustmark National Bank, NBC Oklahoma and Eastman National Bank. Such use was limited to enumerated categories of expenses listed in the Budget. To provide adequate protection, Respondents retained a valid, perfected and enforceable continuing replacement lien and security interest, the "Rollover Lien," in all assets of the Debtors existing on or after the Petition Date of the same type as the Cash and Pre-Petition Collateral, together with proceeds, rents, products and profits thereof and access to financial information and reports. The Interim Cash Collateral Order provided a carve out from Respondent's Rollover lien rights for the payment of fees to the Clerk of Court for the Bankruptcy Court, the Office of the United States Trustee, and court approved fees of Debtors counsel up to the amount of $30,000.00.

Subsequent to the entry of the Interim Cash Collateral Order, the Debtors filed five additional interim cash collateral motions and orders. [Docket Nos. 117, 158, 222, 234, 252, 353] to establish a budget for the Debtors' use of cash collateral and interim adequate protection payments. The Final Order Authorizing the Use of Cash Collateral and Granting Related Relief [Docket No. 393] was entered on October 17, 2017. In addition to the Rollover Lien, the Final Order provided for bi-weekly adequate protection payments to the Respondents in the amount of $50,000 each, as well as a Supplemental Lien in all of the assets of the Debtors subject to pre-petition perfected liens and the carve out. The final order also provided for a Super Priority administrative expense claim in favor of Respondents, and enlarged the carve out provision to include the unpaid fees and expenses of Debtors' professionals up to the amount of $230,000.00, and the fee of the Committee and its counsel incurred through the termination date up to $80,000 and other professionals up to $40,000.00. BOKF takes the position that the cash collateral order's rollover lien extends to all the Debtors; the Unsecured Creditors Committee takes the position that the Order only applies to the Debtors who operated hospitals and the management company as those were the parties who moved to use cash collateral.

F.    DIP Financing. "DIP Financing" refers to the Management's DIP funding approved in November 2017 and provided thereafter. The DIP Financing Claim will be repaid in full, with no interest, from the proceeds of the CHCT loan (i.e., the CHCT Debt).

G.    Closure or Sale of Certain Hospitals Post-Bankruptcy. During the course of the bankruptcy case, it became apparent that certain unprofitable hospitals would need to close. The Bankruptcy Court, at various times, authorized closure or sale of the Debtor's hospitals in Denham Springs, LA, Greenwood, MS, Tulsa, OK, and Wichita, KS. Denham Springs was

sold for $10,000 but the Debtors avoided any wind down costs. Cash collateral was used to cover the wind down costs of Greenwood. The DIP Financing was used to cover the wind down costs of Tulsa, OK and Wichita, KS.

H. **Marketing of the Debtors' Hospitals For Sale.** As a part of the Debtors' efforts to provide the best recovery for creditors, Stout's investment banking services were utilized to market the Debtors' hospitals on an individual basis or as a whole. Stout began its marketing outreach on September 5, 2017, approaching a total of 84 potential buyers, including 52 strategic buyers and 32 financial buyers. Multiple phone and email out reaches were made, including electronic distribution of an executive summary of the Company to describe the opportunity ("Teaser"). Of the 84 buyers approached, 12 executed the Non-Disclosure Agreement ("NDA") and reviewed the Confidential Information Memorandum ("CIM") as well as comprehensive financial and operating documentation provided through a virtual datasite. Stout also had in-depth follow-up discussions with each of the 12 buyers.

The buyers were requested to submit an Indication of Interest ("IOI") by September 29, 2017 (the "Bid Deadline"). A total of 4 buyers submitted IOIs. One buyer initially submitted interest in acquiring Houma at a valuation of $1.3M to $2.3M (2.0x to 3.5x TTM EBITDA); but subsequently backed out of the process upon further site diligence. Another buyer submitted interest in acquiring Tulsa, Wichita, and Albuquerque for a combined valuation of $200K to $1M for all three entities, and was unwilling to upward revise its valuation. A third buyer submitted interest in acquiring Las Vegas and no indication of value was provided. A fourth buyer submitted interest in acquiring Edmond and no indication of value was provided. Upon further discussions and diligence all four buyers dropped out of the process.

Essentially, there was no market for these hospitals that could deliver value for unsecured creditors. The Debtors therefore propose the instant Plan due to the lack of viable alternatives.

I. **Value of the Assets and Deficiency Claims.**

Stout has prepared an Enterprise Valuation of the Debtors, contributed Non-Debtors Hospitals and of NewCo, which is attached as Exhibit E. Schedule V is an estimated value of the Accounts Receivables that will be liquidated pursuant to the Plan. BOKF's unsecured deficiency claim on the RLOC is estimated to be $1.5 million on a balance of appromixately $11.5 million, and their unsecured deficiency claim on their real estate loan is estimated to be $10 million on a balance of approximately $24 million. CHCT of Louisiana, LLC's unsecured deficiency claim on their real estate loan is estimated to be $6.7 million on a claim of approximately $10.7 million. These estimates are based on the Proofs of Claim filed in the case by these creditors.

J. **Exclusivity**

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors have a certain amount of time within which (a) to file their Plan; and (b) to solicit acceptances of their timely filed Plan before other parties in interest are permitted to file plans. This time period has expired and other parties are free to file plans and disclosure statements.

17

K.    Claims Bar Date

On September 12, 2017, the Bankruptcy Court ordered that the claims bar date for general unsecured claims be set for November 7, 2017.

L.    Administrative Claim Bar Date

The time for the filing of administrative claims, other than fee claims, will be 30 days from the effective date of the Plan.

Each Professional Person who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date. The failure to timely file and serve such Fee Application shall result in the Fee Claim being forever barred and discharged, and no distribution shall be made under this Plan on account of any such barred and discharged Claim. Payment of Fee Claims will occur within thirty days of the allowance of such claims from Discharged Accounts Receivable.  To the extent such claims exceed $1,500,000, NewCo will satisfy such claims.

M.    Payment of Administrative Expense Claims

Except to the extent any Person entitled to payment of an Allowed Administrative Expense Claim has received payment on account of such Claim prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Administrative Expense Claim shall receive, in full satisfaction of its Allowed Administrative Expense Claim, Cash in an amount equal to the amount of such Allowed Administrative Expense Claim on the later of (i) the Effective Date or (ii) the date of entry of a Final Order determining and allowing such Claim as an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim.

For the avoidance of doubt, no Administrative Expense Claim that remains subject to objection on or before the Claim Objection Deadline (i.e., such Administrative Expense Claim is Contested) shall receive a distribution under this Plan unless and until the Reorganized Debtors determines that no objection will be filed with respect to such Claim. Upon such a determination or agreement between the Reorganized Debtors and the holder of any Administrative Expense Claim, any such Administrative Expense Claim shall become Allowed and paid by the pursuant to this Plan. The Liquidation Trustee will establish Cash reserves sufficient to satisfy potential Plan Distributions to holders of Administrative Expense Claims that are Contested.

If the Debtors' records reflect that the holder of an administrative expense claim received payments from the Debtors during the ninety (90) days (or in the case of insiders, one (1) year) before the Petition Date, that holder's claim will not become an Allowed Administrative Expense Claim until the holder's potential preference liability has been resolved.

A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 2.1(a) shall become an Allowed Administrative Expense Claim only to the extent allowed by Order of the Bankruptcy Court. All Allowed Fee Claims shall be treated as Allowed Administrative Expense Claims as set forth in Section 2.1(b) above, or shall be paid on such other terms as may be agreed upon in writing by the holder of the applicable Claim.

An estimate of the Professional Fees to be paid in these bankruptcy cases is attached hereto as Schedule IV.

## VII.
## POTENTIAL LITIGATION

A.    Retained Estate Causes of Action

Except as otherwise provided in the Plan, each Cause of Action of any Debtor shall be preserved and, along with the exclusive right to commence, pursue, and enforce such Cause of Action in any appropriate court or tribunal, shall vest exclusively in the Liquidating Trust as of the Effective Date.

Unless a claim or Cause of Action against a creditor or other Person is expressly waived, relinquished, released, compromised, settled or transferred in the Plan or any other Final Order, the Debtors and Debtor Representative expressly reserve such claim or Cause of Action for later pursuit by the Debtor, as applicable, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon, after, or as a result of the Confirmation Date or Effective Date of the Plan, the Disclosure Statement, the Plan or the Confirmation Order. In addition, the Debtors and Debtor Representative, as applicable, expressly reserve the right to pursue or adopt any claims (and any defenses) or Causes of Action of the Debtors, as trustees or representatives for or on behalf of the creditors, not so specifically and expressly waived, relinquished, released, compromised, settled or transferred that are alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person, including, without limitation, the plaintiffs or codefendants in such lawsuits.

Any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods, tort, breach of contract or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, should assume that such obligation, transfer, or transaction may be reviewed by the Debtor Representative subsequent to the Effective Date and may, to the extent not theretofore waived, relinquished, released, compromised, settled or transferred, be the subject of an action or claim or demand after the Effective Date, whether or not (a) such Person has filed a proof of claim against the Debtors in the Chapter 11 Cases, (b) such Person's proof of claim has been objected to, (c) such Person's Claim was included in the Debtors' Schedules, or (d) such Person's scheduled Claim has been objected to by the Debtor Representative or has been identified by the Debtors as disputed, contingent, or unliquidated.

19

No Person may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Cause of Action against them as any indication that the Debtors, or another applicable party will not pursue any and all available Causes of Action against them. The Debtors, the Estates and the Debtor Representative expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise explicitly provided in the Plan.

The retained claims and Causes of Action, include, without limitation:

• Causes of Action as defined in the Plan;

• Objections to Claims and Equity Interests under the Plan;

• Any and all litigation, claims, or Causes of Action of the Debtors and any rights, suits, damages, remedies, or obligations, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, relating to or arising from the acts, omissions, activities, conduct, claims, or Causes of Action listed or described in the Plan, Disclosure Statement, or the Confirmation Order;

• Any other litigation, claims or Causes of Action, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses, assets or operations or otherwise affecting the Debtors.

• Possible claims against vendors, customers or suppliers for warranty, indemnity, back charge, set-off issues, overpayment or duplicate payment issues and collections and accounts receivables matters;

• Possible claims against utilities or other Persons or parties for wrongful or improper termination of services to the Debtors;

• Possible claims for any breaches or defaults arising from the failure of any Persons or parties to fully perform under contracts with the Debtors before the assumption or rejection of the subject contracts;

• Possible claims for deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor, factor or other Person;

• Possible claims for damages or other relief against any party arising out of environmental, asbestos and product liability matters;

• Actions against insurance carriers relating to coverage, indemnity or other matters;

• Counterclaims and defenses relating to notes or other obligations;

• Possible claims against local, state and federal taxing authorities (including, without limitation, any claims for refunds of overpayments);

20

• Contract, tort, or equitable claims which may exist or subsequently arise;

• Any claims of the Debtors arising under Section 362 of the Bankruptcy Code;

• Equitable subordination claims arising under Section 510 of the Bankruptcy Code or other applicable law;

• Any and all claims arising under chapter 5 of the Bankruptcy Code and all similar actions under applicable law, including, but not limited to, preferences under Section 547 of the Bankruptcy Code, turnover Claims arising under Sections 542 or 543 of the Bankruptcy Code, and fraudulent transfers under Section 548 of the Bankruptcy Code, including but not limited, to any transfers listed the Debtors' Statements of Financial Affairs;

• Any derivative Causes of Action, of the Debtors pursuant to the Bankruptcy Code or any other statute or legal theory or theory under equity.

B.    Releases of Causes of Action Against Management

The alleged Chapter 5 causes of action against August Rantz, III, August Rantz, IV, and Timothy Howard ("Management") on behalf of the Debtors will be compromised in light of relevant jurisprudence and the specific facts of the case, and given their contributions of cash and assets to the reorganization.

In order to maintain a claim for constructive fraud under section 548 of the Bankruptcy Code, Petitioner must prove that the transfer was made for less than reasonably equivalent value, and that the transfer was made at a time when debtor was insolvent or was made insolvent by transfer. *In re Randy*, 189 B.R. 425 (Bkrtcy. N.D. Ill.1995.) Value, for purposes of section 548, is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor." 11 U.S.C. § 548. Certain courts have held that reasonably equivalent value also includes indirect benefits ultimately flowing to the debtor from a benefit paid to a third party, or if there is no negative net effect on the estate. *In re Jeffrey Bigelow Design Group, Inc*., 956 F.2d 479 (4th Cir. 1992); *Mellon Bank, N.A. v. Metro Communications, Inc*., 945 F.2d 635 (3rd Cir. 1991), as amended, certiorari denied 112 S.Ct. 1476, 503 U.S. 937, 117 L.Ed.2d 620; *In re Bowers-Siemon Chemicals Co.*, 139 B.R. 436 (Bkrtcy. N.D. Ill. 1992). The general rule is that a parent or sister entity will be presumed to have received a benefit from its downstream or cross stream guarantee of obligations of its subsidiary or affiliate, in the form of increased stock value from the increased strength and value of the subsidiary or affiliate. *In re Renegade Holdings*, 457 B.R. 441 (Bkrtcy. M.D.N.C. 2001). Likewise, indirect benefits in the form of funds flowing from parent to guarantor subsidiary, or intangible benefits in form of maintenance of parent's financial strength, constitute fair consideration for subsidiary's guarantying of parent's debt. *In re Lawrence Paperboard Corp*., 76 B.R. 866 (Bkrtcy. D. Mass. 1987).

Here, approximately seven (7) million dollars of the CHCT Louisiana ("CHCT") loan proceeds to Youngsville was wired to AMG Management Group, LLC, ("AMG") who had guaranteed the loan. These transfers occurred after Congress passed enabling legislation that

changed LTAC reimbursement rates but just before the regulations implanting the same were imposed in September, 2016.Thereafter, AMG transferred funds to three insiders, August Rantz, III, August Rantz, IV, and Timothy Howard in varying amounts:

- Distributions totaling $1,500,000.00 were made to August Rantz, IV and Timothy Howard to cover their tax liabilities from the companies.
- Rantz III, Holdings was transferred $400,000.00 in payment of antecedent debts due from AMG Hospital Co. II and AMG Hospital Co. III.
- August Rantz, III was transferred $4,600,399.00 transfer in payment for his stock redemption from a multitude of AMG affiliate companies.

As evidenced by a confidential memorandum circulated to CHCT by representatives of AMG, CHCT was aware from the outset of the proposed usage of the loan proceeds, including to provide limited liquidity to equity holders and to facilitate the buyout of August Rantz, III.

The challenged transfers to August Rantz, IV and Timothy Howard for $750,000.00 each from the CHCT Loan proceeds were tax distributions. In a recent 2013 case, the Eleventh Circuit held that such distributions to shareholders for tax liability constitute satisfaction for antecedent debts and represent a reasonably equivalent exchange of value, because the debtor company would otherwise have to pay income taxes itself should it not elect to pass such liability to its shareholders. *In re Northlake Foods, Inc*., 715 F.3d 1251 (11th Cir. 2013). Accordingly, AMG believes it was obligated to reimburse the insiders in exchange for the insiders assuming personal tax liability for company income. Certain creditors, including the Unsecured Creditors Committee, disagrees with this assertion because the operating agreements for the various Debtors did not specifically provide for reimbursement of taxes paid by the equity holders.

Regarding the transfer of $400,000.00 to Rantz III Holdings in payment of antecedent debts due from AMG Hospital Co. II and AMG Hospital Co. III, the Code is clear that the satisfaction or securing of a present or antecedent debt constitutes reasonably equivalent value. 11 U.S.C. § 548. With respect to the challenged transfer to August Rantz, III for his stock buyout, there are considerable statutory and jurisprudential hurdles. First, Petitioner must overcome the issue of the Section 546(e) safe harbor, which has recently been interpreted by certain courts to apply to leveraged buyouts such as in the instant case. *In re Physiotherapy Holdings, Inc*., 2016 WL 3611831, 62 Bankr. Ct. Dec. 213 (Bankr. D. Del. 2016); *Contemporary Industries Corp. v. Frost*, 564 F.3d 981 (8th Cir. 2009); *In re Kaiser Steel Corp*., 952 F.2d 1230 (10th Cir. 1991); *In re Plassein Intern. Corp*., 590 F.3d 252 (3rd Cir. 2009); *In re Elrod Holdings Corp*., 394 B.R. 760 (Bankr. D. Del. 2008). However, this issue is currently under review in the U.S. Supreme Court, in the case of *Merit Management Group, LP v. FTI Consulting, Inc., with the case having been recently argued in November of 2017*. Furthermore, Petitioner must prove that the transfer was made for less than reasonably equivalent value and that the transfer was made when the Debtor was insolvent or rendered the Debtor insolvent. As the Fifth Circuit recently stated, allegations of insolvency have to be specific and backed up by allegations of specific facts to defeat a 12(b)(6) motion for purposes of fraudulent conveyance litigation. *In re ATP Oil & Gas Corporation*, No. 17-30077 (5th Cir. October 27, 2017). The jurisprudence is clear that Debtor's business in this case should be valued on a "going concern basis" rather than the liquidation value of its assets less its liabilities. Insolvency is defined in the Code as a

"financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation[.]" 11 U.S.C. 101(32)(A). Unless a debtor is on its "deathbed," a going concern valuation should be used. *In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 341 (E.D. Penn. 1988); *Matter of Taxman Clothing Co., Inc.*, 905 F.2d 166, 170 (7th Cir. 1990). A business does not have to be thriving to receive going concern valuation, but before the going concern valuation is abandoned, the business must be "wholly inoperative, defunct or dead on its feet," or liquidation in bankruptcy must be clearly imminent. *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1067 (3rd Cir. 1992); *In re ECB I, Inc.*, 380 B.R. 348, 355 (Bankr. Del. 2008); *In re Dressel Associates, Inc.*, 536 B.R. 158, 164 (W.D. Penn. 2015). In this case, the challenged transfers occurred before the regulatory changes were passed which led to the bankruptcy filing, and over one and one half years before Debtor actually filed for bankruptcy relief. Additionally, the Debtor's EBITDA, quality earning reports and CHCT's own due diligence in granting Debtor the eleven million dollar loan indicate that Debtor was and remained solvent at the time of the challenged transfer. Furthermore, given the going concern valuation of Debtor and the various affiliates, the evidence indicates that August Rantz, III, was not overpaid for his stock redemption. If the stock was redeemed for its share price on the stock exchange, and had notable value, the transaction will normally be upheld. *PHP Liquidating, LLC v. Robbins*, 291 B.R. 592 (D. Del. 2003), affirmed 128 Fed.Appx. 839, 2005 WL 488785. Similarly, the insolvency issue is a significant barrier to recovery for the later transfers of $409,500.00 and $308,232.35 to August Rantz, III, which did not come out of the CHCT loan proceeds or the Youngsville debtor, but from other Debtors. These payments occurred during the one year insider preference period, but likely qualify for the ordinary course of business defense, as they were made monthly, and prior to any default. *See In Re Bayonne Medical Center*, 429 B.R. 152 (Bkrtcy. D. N.J. 2010).

Lastly, under Section 550 of the Code, the Trustee may recover property from the initial transferee of such transfer, the entity for whose benefit such transfer was made, or any immediate or mediate transferee of such initial transferee. However, the Trustee may not recover from subsequent transferees of the initial transferee, if they took for value (including satisfaction or securing of a present or antecedent debt), in good faith, and without knowledge of the voidability of the transfer avoided. 11 U.S.C. 550. Here, AMG Management Company was the initial transferee of the CHCT loan proceeds, with August Rantz, III, August Rantz, IV, and Timothy Howard being classified as subsequent transferees of AMG. Given the Debtor's EBITDA and earnings reports, the insiders had no notice of any insolvency, deteriorating financial conditions or inadequate capitalization. Consequently, the Trustee may not recover from them, as they took in good faith, for value, without knowledge of the voidability of the transfers. 11 U.S.C. 550. *See In re Equipment Acquisition Resources, Inc*., 803 F.3d 835 (7th Cir. 2015); *In re Sherman*, 67 F.3d 1348 (8th Cir. 1995), rehearing and suggestion for rehearing en banc denied.

The Unsecured Creditors Committee has raised an issue regarding potential claims regarding use of corporate American Express credit cards for personal use. Stout, the financial advisors to the Debtors, has reviewed the available American Express credit card statements ranging from March 2016 to August 2017, after which the credit card accounts were closed. The account statements are not continuous over this period, and the Debtor no longer has online access to its account to retrieve any missing statements. Regardless, the statements reviewed by

Stout contain no definitive indication that the credit cards were used for personal expenses or other non-business expenditures. The vast majority of the expenditures are travel related expenses, such as fuel, airline tickets, car rentals, meals and lodging, and marketing and entertainment costs. Additionally, there is no pattern of activity to indicate that corporate credit cards were used for personal purchases that were later "reimbursed" by the individual.

The Unsecured Creditors Committee has raised an issue regarding the prior ownership of Acadiana Management Group, LLC, of a one half interest in an LLC that owned a Lear Jet that was used for corporate purposes by the Debtors. The interest in that LLC has been liquidated in exchange for forgiveness of debt owed by Acadiana Management Group, LLC, to the LLC that owned the Lear Jet. This was done with Bankruptcy Court approval. Additionally, the Unsecured Creditors Committee has raised an issue regarding pre-petition payments that were made to R & H Rehab II, LLC, a company owned by management that owns a fishing boat in Florida, for crewing of the boat. The boat was sometimes used for corporate purposes and sometimes not. These payments are potential fraudulent conveyances, but the point in time in which the Debtors became insolvent presents an obstacle to recovery. However, the claim of the Estate of Acadiana Management Group, LLC, against R & H Rehab, LLC, in the approximate amount of $1,535,386.51 which is noted on the books and records of both entities as a loan, is not being released and will be placed in the Liquidating Trust and will not be released. However, given the value of the boat and the estimated secured claim against the boat, the Debtors do not estimate recovery on the claim will be substantial.

For purposes of a liquidation analysis in Chapter 7, Stout, the financial advisors to the Debtors, along with counsel to the Debtors, has estimated the recovery on these potential causes of action to be approximately 5% to 10% of the face value of these claims. These amounts have been incorporated into the liquidation analysis attached to this Disclosure Statement. Given BOKF's roll over lien on said causes of action stemming from the cash collateral order, the recovery to general unsecured creditors is estimated to be negligible.

Given the obstacles to recovery outlined above, pursuit of the alleged Chapter 5 actions would prove disadvantageous to the reorganization estate and to the interests of the unsecured creditors. The ongoing success of the reorganization estate will provide more value to the unsecured creditors, whose interests Section 548 was designed to protect. Moreover, Management is contributing approximately $4.750 million in value to the reorganization, in the form of a rehabilitation hospital in Covington with a value that Stout has estimated to be $4.5 million and $250,000 in cash. The amounts management are contributing to the reorganization far exceed the face amount of the alleged claims against them. Compromise of these alleged claims is in the best interest of the Estate.

The Unsecured Creditors Committee disagrees with the Debtors' analysis with respect to the claims against the insiders and does not recommend that Class 8A Unsecured Creditors vote for this Plan.

Due to the size and scope of the Debtors' business operations and the multitude of business transactions therein, there may be numerous other claims and Causes of Action that currently exist or may subsequently arise, in addition to the claims and Causes of Action identified above.

24

The Debtors and Committee are also continuing to investigate and assess which claims and Causes of Action may be pursued. The Debtors and Debtor Representative do not intend, and it should not be assumed that because any existing or potential claims or Causes of Action have not yet been pursued or do not fall within the list above, that any such claims or Causes of Action have been waived.

C.    Pending Litigation

As of the date hereof, the only known related, material actions pending are as follows:

CHCT Louisiana LLC's Motion for Leave to Derivatively Pursue Avoidance Action Against August Joseph Rantz, III, August Joseph Rantz, IV, and Timothy W. Howard, Case No. 17-50799 (Before the U.S. Bankruptcy Court, Western District of Louisiana, Lafayette Division).  This motion has been denied without prejudice by the Court, and so the motion could be renewed and the Unsecured Creditors Committee has indicated that it may make a similar motion.

VIII.
THE CHAPTER 11 PLAN

As a result of the Chapter 11 Cases and through the Plan, the Debtors submit that creditors will obtain a greater recovery under the Plan than any recovery that would be available if the Debtors' Assets were liquidated under chapter 7 of the Bankruptcy Code. The Plan is annexed hereto as Exhibit "A" and forms part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

A.    Substantive Consolidation

Sections 3.2 and 6.2 of the Plan provide that, except as otherwise provided therein, each Debtor shall continue to maintain its separate corporate existence after the Effective Date for all purposes other than the treatment of Claims under the Plan. Except as expressly provided in the Plan (or as otherwise ordered by the Bankruptcy Court), on the Effective Date: (a) all assets (and all proceeds thereof) and liabilities of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other, (b) no distributions shall be made under the Plan on account of Intercompany Claims among the Debtors and all such Claims shall be eliminated and extinguished, (c) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor, and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, (d) each and every Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated one Claim against and obligation of the consolidated Debtors, and (e) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off

25

against the debts of any of the other Debtors. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Reorganized Debtors. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any Claim or Interest or the ability of the Reorganized Debtors or the Litigation Trust Trustee, as applicable, to seek to have any Claim or Interest subordinated in accordance with any contractual rights or equitable principles. Notwithstanding anything in Sections 3.2 and 6.2 of the Plan to the contrary, all post-Effective Date fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930, if any, shall be calculated on a separate legal entity basis for each Reorganized Debtor. In the event that the Bankruptcy Court does not approve the substantive consolidation of all of the Estates, the Debtors reserve the right to revoke or withdraw the Plan as to any Debtor(s) whose Estate(s) cannot be substantively consolidated.

The Debtors believe that substantive consolidation under the Plan is appropriate due to various factors, specifically those expressed in the framework provided in the recent matter of *In re ADPT DFW Holdings, LLC*, 574 B.R. 87 (Bankr. N.D. Tex. 2017), including but not limited to the following:

a) the Debtors' nerve center at which all policy and management decisions are made on behalf of all of the Debtors is at the corporate enterprise's headquarters at AMG – Lafayette;

b) pursuant to billing and hospital management agreements, AMG provides operational and financial management/administration for each of the Debtors' affairs from its corporate enterprise's headquarters at AMG – Lafayette, including billing, accounting and collection services;

c) all payroll for the Debtors' employees is performed by AMG and carried out from the enterprise's headquarters at AMG – Lafayette;

d) all cash for the corporate enterprise is swept and managed out of a singular master concentration account;

e) the Debtors maintain a central cash management system, pursuant to which all debts are paid;

f) all operating entity Debtors are borrowers on a single BOK line of credit in which AMG and the holding entity Debtors provide security, including AMG's guaranty with assignment of its management contracts with the borrowers, effectively rendering all Debtors joint and severally liable;

g) the referenced BOK debt essentially results in a de facto consolidation, as the BOK security position across the various Debtor entities results in no equity for separate creditors of the individual Debtors;

26

h) significant and predominate creditors extend credit and trade debt across numerous separate Debtor entities with billings sent to the corporate enterprise's headquarters at AMG – Lafayette, such that the Debtors are viewed as a single economic unit;

i) substantial pre-petition loans were made among the Debtors as reflected in the Debtors' books and records, resulting in Intercompany Claims;

j) all Debtor entities are taxed as pass through entities, resulting in taxation flowed to ownership, namely, August Rantz IV and Timothy W. Howard;

k) the Debtors are commonly owned and/or managed, and the directors and officers of the parent company, AMG, directly control the affairs of all Debtors, and the individuals who are insiders of AMG are also insiders of the subsidiary Debtors;

l) under a master lease agreement with AMG, operational equipment for each of the Debtors' facilities are deployed to the operating entity Debtors;

m) distributions for general unsecured creditors will be based on recoveries from litigation claims;

n) Chapter 5 claims against the insiders and ownership, namely, August Rantz, III, August Rantz IV and Timothy W. Howard, began with a loan to AMG Realty Youngsville, LLC, but the funds were deposited with Acadiana Management Group, LLC, and then disbursed to the insiders by Acadiana Management Group, LLC, via bookkeeping entries on the ledgers of numerous other Debtors;

o) any and all fraudulent conveyance claims are multilayered across the separate Debtor entities and through common ownership and management; and

p) the Debtors do not maintain any separate director and officer insurance liability policies.

Because of the foregoing factors, substantive consolidation will achieve a fair result for all creditors of the Debtors and will enable the assets of the Debtors to be administered in an efficient manner. *ADPT DFW Holdings, LLC*, 574 B.R. 87, 103–04 (Bankr. N.D. Tex. 2017). If the estates are not substantively consolidated, the time and expense to allocate assets and liabilities between estates will be unduly burdensome and without practical effect. *Id.* at 104. Moreover, given the fact that the unsecured creditors are effectively "out of the money" as to all Debtors, there is no rationale for disparate treatment among creditors. In the event that these bankruptcy cases are not substantively consolidated for purposes of the plan, the requirements of 11 U.S.C. § 1129(a)(10) would nonetheless apply on a "per plan" basis, meaning that acceptance of one impaired class for any Debtor involved in the proceedings would provide authority for confirmation of the Plan under the plain statutory language. *In re Transwest Resort Properties, Inc.*, 554 B.R. 894, 899-901 (D. Ariz. 2016); See also *In re SPGA, Inc.*, 2001 WL 34750646 (Bankr.M.D.Pa. 2001); *In re Enron*

27

*Corp.*, 2004 WL 6075307, 2004 Bankr. LEXIS 2549; *In re Charter Communications*, 419 B.R. 221, 266 (Bankr.S.D.N.Y. 2009).

The Unsecured Creditors Committee disagrees with the Debtors' analysis regarding substantive consolidation and requests that Class 8A Unsecured Creditors vote against this Plan.

B.    Treatment of Claims Against and Equity Interests in the Debtors

The classes of Claims against and Equity Interests in the Debtors shall be treated under the Plan as follows:

(a)    Class 1 – Priority Non-Tax Claims. Each holder of an Allowed Priority Non-Tax Claim shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable and contractual rights of each holder of an Allowed Priority Non-Tax Claim with respect to such Claim shall remain unaltered, except as provided in sections 1124(2)(A)-(E) of the Bankruptcy Code, and such holder of an Allowed Priority Non-Tax Claim shall be paid Cash in an amount equal to its Allowed Priority Non-Tax Claim on the Plan Distribution Date, with the exception of paid time off employee wage claims which will be honored by NewCo.

(b)    Class 2 – BOKF Greenwood RLOC Claim. On or before the Effective Date, Greenwood will be liquidated and will have sufficient funds on hand to pay the Greenwood RLOC Claim in full as to principal and accrued interest, fees and expenses. On the Effective Date, these funds shall be disbursed in full satisfaction of this portion of the BOKF Greenwood RLOC Claim.

(c)    Class 3 – BOKF RLOC Claim.
CHCT Louisiana, LLC ("CHCT") is currently the holder of this claim.

CHCT will fund NewCo debt as described herein up to a total amount of $22,750,000 (the "CHCT Debt") comprised of (i) the aforementioned BOKF RLOC debt purchase at a price of up to $8,750,000, (ii) the payment of the CHCT deficiency claim of $6,700,000 (the "CHCT Deficiency Claim"), and (iii) additional incremental CHCT debt financing of $7,300,000. Management will contribute to NewCo their Equity Interests in Covington-AMG Rehabilitation Hospital, LLC ("Covington"); and Rantz III will make the UCC Contribution described in Section 6.2 of the Fourth Amended Plan (collectively, the "NewCo Principal Contribution"). The sources and uses for the exit plan financing (the "Agreed Sources and Uses") are as follows:

**AMG Exit Plan Sources and Uses**

| | |
|---|---|
| CHCT Debt | 22,750,000 |
| Minimum Equity - Contribution of N. Alabama & Covington Hospitals | |
| Gus Rantz III - UCC Contribution | 250,000 |
| **Total Sources** | **23,000,000** |

28

| | |
|---|---|
| BOKF - Up to | 8,750,000 |
| CHCT - Up to | 6,700,000 |
| Administrative Expenses - Up to | 1,500,000 |
| UCC - Up to | 250,000 |
| DIP Financing - Up to | 2,000,000 |
| Repay FB&T - Up to | 2,600,000 |
| Minimum NEWCO Liquidity | 500,000 |
| Capital Lease and Equipment Notes | 700,000 |
| **Total Uses** | **23,000,000** |

The CHCT Debt will include no pre-payment penalty or premium, closing costs, or facility fees. The CHCT Debt will accrue interest as follows:

a.      During the initial three-year period following the Effective Date (the "Interim Period"), the outstanding balance of the CHCT Debt will accrue interest at the rate of 9.0% per annum, with 5.0% of the interest being paid current and 4.0% accrued (paid-in-kind).

b.      Following the Interim Period, the outstanding balance of the CHCT Debt will accrue interest at the rate of 9.00% per annum, with 6.00% of the interest being paid current and 3% accrued (paid-in-kind), subject to the adjustments as outlined in c. below.

c.      Following the Interim Period, for any year the outstanding principal balance of the CHCT Debt is more than (i) $10 million, the total pay interest rates shall be increased by 0.75%, or (ii) $5 million the total pay interest rates shall be increased by 0.25%.

The CHCT Debt will have a maturity date that is 13 years following the Effective Date.  The CHCT Debt will be paid interest only (excepting the paid-in-kind interest, which shall accrue) during the Interim Period, subject to the Repayment Provision (as defined in Section 6.2 of the Fourth Amended Plan).  Following the Interim Period, principal and interest on the outstanding balance of the CHCT Debt will be repaid using a 10-year amortization as described in Section 6.2 of this Plan.

The assets of the Debtors that are collateral for the BOKF RLOC claim will be transferred to NewCo, and in order to secure repayment of the CHCT Debt, CHCT will maintain a first priority security interest on all NewCo and NewCo's subsidiaries ownership interests and assets, including without limitation, all accounts receivable, equipment, tenant improvements, licenses, provider agreements, and subject only to existing equipment leases that are not paid in full.

Included in Class 5A are the claims of CHCT against LTAC of Louisiana, LLC with respect to an assignment of lease held by CHCT.

Additional terms and conditions related to the Agreed Sources and Uses and Repayment are set forth in Section 6.2 of this Plan.

 (d)      Class 4 – DIP Financing Claim.  "DIP Financing" refers to the Management's DIP funding approved in November 2017 and provided thereafter.  The DIP Financing Claim will be repaid

in full, with no interest, from the proceeds of the CHCT loan (i.e., the CHCT Debt).

(e)     Class 5 - Real Estate Company Debtors' Secured Claims. The real property assets of the real estate company Debtors' estates will be sold free and clear of liens, either (at the option of the secured creditors): (a) to the secured creditors or their designees via credit bids at a price to be mutually agreed upon; (b) to third parties for cash; or (c) otherwise as directed by the secured creditors.  Any cash in the Real Estate Company Debtors' estates is the collateral of particular secured creditors of those estates and will be paid to those creditors on the effective date.  The bankruptcy court has continuing jurisdiction over any sale process, and the secured creditors have the ability to credit bid the full amount of their claims in any sale scenario.  Class 5A will consist of CHCT of Louisiana, LLC, whose collateral consists of a building owned by AMG Realty Youngsville, LLC, and any cash in that entity.  CHCT has been granted full relief from the automatic stay imposed by Section 362(a) of the Bankruptcy Code as to Youngsville, and the real property, improvements, and interests owned by Youngsville, including Youngsville's right, title and interest under its hospital lease with LTAC of Louisiana, LLC.  Debtors have agreed to transfer to CHCT the title to the Youngsville real and personal property by dation, consensual foreclosure, and/or other process requested by CHCT.  Class 5B will consist of BOKF, whose collateral for its real estate loan consists of buildings owned by AMG Realty I, LLC, or its subsidiary, CHFG Albuquerque, LLC, and cash in those entities.  The deficiency claims of these creditors will be addressed in Class 8A.

(f)     Class 6 – Creditors Holding Assignments of Leases Rejected by Operating Debtors. BOKF and CHCT of Louisiana, LLC, hold assignments of leases from the Real Estate Company Debtors.  These leases are with between the Real Estate Company Debtors and the Operating Debtors and certain Debtors who previously operated LTAC hospitals but have ceased operations post-petition.  These leases have a security interests in all movable property of the lessees to secure the payment of rent.  On the date of Confirmation of the Plan, unless otherwise previously ordered, these collateral assignments will be deemed converted to actual assignments of those leases.  The leases provide that the said security interests to secure rent are subordinate to the BOKF RLOC claim.  Given the amount of BOKF's claims and the value of the Operating Debtors' assets, these claims will be deemed unsecured and will be addressed and will vote with Class 8A, except for the claims of CHCT of Louisiana, LLC, which will be addressed in Class 3.  These particular creditors will vote these claims arising from the assigned leases.  For purposes of clarity, the claims are held by the following creditors against the following Debtors:

    1.     CHCT of Louisiana, LLC against LTAC of Louisiana, LLC
    2.     BOKF against LTAC Hospital of Wichita, LLC
    3.     BOKF against Albuquerque-AMG Specialty Hospital, LLC

(g)     Class 7 – Intercompany Claims, Including Non-Debtor Affiliate Claims.  On the Effective Date, all Intercompany Claims, including the claims of Non-Debtor Affiliates against the Debtors, will be extinguished, and no holder of any such Intercompany Claim will receive or retain any property or rights under the Plan on account of such Claim.

(h)     Class 8 – General Unsecured Claims.  Class 8A, General Unsecured Claims, will receive payments from the Rantz III UCC Contribution of $250,000 and the Liquidating Trust.  Class

8B, Critical Vendors named in the previously granted Critical Vendor Motion, will continue to receive 1/60th of their claims monthly until paid in full by NewCo, in accordance with the terms of the Critical Vendor Motion, and will not participate in the Liquidating Trust. CHCT will waive its real estate deficiency claim for purposes of distributions to general unsecured creditors for CHCT's claim (which will be paid by NewCo). The Debtors and CHCT agree that the CHCT Deficiency Claim is valued at $6,700,000 but will be addressed in Class 3. Further, if Class 8A votes in favor of the Plan such that Class 8A is deemed an accepting class, CHCT will waive any diminution claims with respect to the BOKF RLOC debt that it purchased.

(i)     Class 9 – Equity Interests.  No holder of an Equity Interest shall receive or retain any property or rights under this Plan on account of its Equity Interests.

        Notwithstanding anything to the contrary, including without limitation, the cancellation and extinguishment of the Equity Interests pursuant to this Plan and the deemed substantive consolidation of the assets and liabilities of the Debtors, each Debtor shall continue to exist as a separate corporate entity after the Effective Date solely for the purpose of implementing the Plan unless and until such Debtor is dissolved in accordance with applicable state law.

C.      <u>Estimated Distributions to General Unsecured Creditors</u>.  Critical Vendors will receive distributions from NewCo in the approximate amount of $2.9 million.  As to General Unsecured Creditors who are to participate in the Liquidating Trust, the following is a summary of the estimated value of the assets to be placed into the Trust:

  a. Chapter 5 Causes of Action (mostly preferences):  $1.5 million
  b. 70.59% interest in and debt claims against LTAC of Feliciana:  speculative value, unknown (See Schedule III)
  c. Cash payment from the plan:  $250,000

For purposes of this disclosure statement, the Debtors have not placed a value on the interest and claims regarding LTAC of Feliciana.  However, it is anticipated that NewCo may offer to purchase the equity interest and claims from the Liquidating Trust post confirmation.  NewCo, through Acadiana Management Group, LLC, will continue to provide management services to LTAC of Feliciana. The valuation of Chapter 5 Causes of Action above is premised in an approximate amount of $15,000,000 in vendor payments being made within the ninety days of the Debtors' bankruptcy filing, which is known as the preference period under the Bankruptcy Code.  This Disclosure Statement assumes a 10 percent recovery on these payments due to ordinary course of business, new value given, and other potential defenses to any actions on preferences.  CHCT, by viture of its purchase of the BOKF RLOC claim, has a lien securing its claim for diminution of its collateral during the pendency of the bankruptcy case.  The Debtors estimate this claim to be approximately $1.5 million.  However, the Unsecured Creditors Committee disputes the amount and efficacy of the claim.  If the Plan is confirmed without a cram down confirmation, CHCT will waive its diminution claim.  Assuming the dimunition claim is waived, the total recovery for the Liquidating Trust is $1,772,000.  If it is not waived because Class 8A rejects the Plan, then it is believed by the Debtors that the diminution claim would reduce the total recovery by approximately $1,500,000.

31

The Debtors believe that BOKF will hold a $10,000,000 unsecured deficiency on their real estate loan, based on representations made by BOKF regarding the amounts of post-petition appraisals BOKF obtained. The amount of lease rejection claims will be approximately $823,819. See attached Schedule VIII. Attached hereto is a schedule of general unsecured trade claims. See attached Schedule VII. The Debtors estimate the total amount of general unsecured trade claims, less critical vendors, to be $12,771,269. See attached Schedule VIII. Based on those figures, the Debtors estimate that $23,595,088 in claims will participate in the Liquidating Trust. The Debtors therefore estimate that unsecured creditors other than critical vendors will receive approximately 7.5% of their claims if Class 8A accepts the Plan. If Class 8A rejects the Plan, their recovery would be de minimus (less than 1%) due to the amount of the diminution claim of CHCT from the BOKF RLOC claim, which has a security interest in the proceeds of the Chapter 5 causes of action which was granted by the Bankruptcy Vourt. However, these recoveries may be reduced for some creditors who face liability for preference claims for payments received outside of the ordinary course of business within the ninety days leading up to the bankruptcy filing.

D.    Sources of Cash for Plan Distributions

In exchange for a contribution of 100% of the equity in a rehabilitation hospital in Covington that Stout estimated the midpoint of value to be $3.4 million the Equity Interests in the Operating Debtors and the start up LTAC based in North Alabama will be reissued to NewCo and those entities will be transferred to NewCo free and clear of all liens. Management, specifically Gus Rantz, III, will contribute $250,000 to the Liquidating Trust.

The Plan will be funded from an exit financing loan of $22,750,000. The sources and uses for the exit plan financing (the "Agreed Sources and Uses") are as identified as follows:

**AMG Exit Plan Sources and Uses**

| | |
|---|---|
| CHCT Debt | 22,750,000 |
| Minimum Equity - Contribution of | |
| N. Alabama & Covington Hospitals | |
| Gus Rantz III - UCC Contribution | 250,000 |
| **Total Sources** | **23,000,000** |
| | |
| | |
| BOKF - Up to | 8,750,000 |
| CHCT - Up to | 6,700,000 |
| Administrative Expenses - Up to | 1,500,000 |
| UCC - Up to | 250,000 |
| DIP Financing - Up to | 2,000,000 |
| Repay FB&T - Up to | 2,600,000 |
| Minimum NEWCO Liquidity | 500,000 |
| Capital Lease and Equipment Notes | 700,000 |
| **Total Uses** | **23,000,000** |

The Debtors, NewCo Principals and CHCT agree that the parties will work in good faith and use best efforts to maintain the Uses line item within the parameters set forth in the Agreed Sources and Uses, provided however, that the parties have flexibility with regard to actual uses required under the UCC, DIP Financing and Administrative Expenses line items (the "Flexible Expense Items") to the extent the actual expended figure exceeds the designated line item. To the extent that any amount exceeds the designated line item for the Flexible Expense Items, first the Uses line item for Capital Lease and Equipment Notes shall be reduced to cover the additional use of funds for the Flexible Expense Items, and second the amounts allocated to day one Minimum NEWCO Liquidity shall be so allocated.

All claims against the Debtors will be referred to treatment in this Plan.

E. <u>The Liquidation Trust</u>

1    Execution of the Liquidation Trust Agreement

The Liquidation Trust Agreement, in a form reasonably acceptable to the Debtors and the Committee, shall be executed on or before the Effective Date, and all other necessary steps shall be taken to establish the Liquidation Trust and the beneficial interests therein, which shall be for the benefit of holders of Allowed Claims as set forth herein. Article VII of the Plan sets forth certain of the rights, duties and obligations of the Liquidation Trustee. In the event of any conflict between the terms of Article VII of the Plan and the terms of the Liquidation Trust Agreement, the terms of the Liquidation Trust Agreement shall govern.

2    Establishment and Purpose of Liquidation Trust

On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Agreement for the purposes of administering the Liquidation Trust Assets and making all distributions to Liquidation Trust Beneficiaries as provided for under this Plan. The Liquidation Trust Agreement shall be substantially in the form provided in the Plan Documents.

The beneficial interests in the Liquidation Trust shall not be certificated, unless otherwise provided in the Liquidation Trust Agreement. The issuance of any beneficial interests of the Liquidation Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration.

3    Vesting of Assets in the Liquidation Trust.

On the Effective Date, in accordance with section 1141 of the Bankruptcy Code, all of the Liquidation Trust Assets as well as the rights, privileges (including, but not limited to, the attorney-client privilege), and powers of the Debtors and their Estates applicable to the Liquidation Trust Assets shall automatically vest in the Liquidation Trust, free and clear of all Claims and Equity Interests for the benefit of the Liquidation Trust Beneficiaries. For the avoidance of doubt, (i) in no event shall the term "Liquidation Trust Assets" be deemed to include any released claims against any Released Parties, and (ii) the Liquidation Trust shall not

33

have the right to assert any released claims against any Released Parties. Upon the transfer of Liquidation Trust Assets to the Liquidation Trust, the Liquidation Trust shall succeed to all of the applicable Debtors' and Estates' rights, title and interest in such Liquidation Trust Assets, and the Debtors shall have no further interest in or with respect to such Liquidation Trust Assets.

Notwithstanding the foregoing, the Plan Proponents reserve the right to modify the Plan to exclude certain assets from transfer to the Liquidation Trust. The Confirmation Order shall constitute a determination that the transfers of Assets to the Liquidation Trust are legal and valid and consistent with the laws of the State of Louisiana.

All parties shall execute any documents or other instruments necessary to cause title to the Assets to be transferred to the Liquidation Trust. The Assets will be held in trust for the benefit of all holders of Allowed Claims pursuant to the terms of the Plan and Liquidation Trust Agreement.

4       Governance of Liquidation Trust.

The Liquidation Trust shall be governed and administered by the Liquidation Trustee, with the advice and assistance of the Oversight Committee, as provided under this Plan and the Liquidation Trust Agreement. Notwithstanding anything to the contrary herein, the Oversight Committee shall act in furtherance of, and consistent with, the purpose of the Liquidation Trust and shall act in the best interests of the Liquidation Trust Beneficiaries.

5       Role of the Liquidation Trustee.

The Liquidation Trustee shall be authorized to exercise and perform the rights, powers, and duties held by the Debtors and the Estates with respect to the Liquidation Trust Assets upon their transfer to the Liquidation Trust, including, without limitation, the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, creditors' committee or any similar official who has been appointed to take control of, supervise, manage or liquidate the Debtors and their Estates, to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Liquidation Trust Assets.

The responsibilities of the Liquidation Trustee shall include, but shall not be limited to: (a) prosecuting through judgment and/or settling the Liquidation Trust Assets and any defense asserted by the Liquidation Trust in connection with any counterclaim or crossclaim asserted against the Liquidation Trust; (b) calculating and making distributions required under the Plan to be made from the Liquidation Trust Assets; (c) filing all required tax returns, and paying obligations on behalf of the Liquidation Trust from the Liquidation Trust Assets; (d) otherwise administering the Liquidation Trust; (e) filing quarterly reports with the Bankruptcy Court with respect to the expenditures, receipts, and distributions of the Liquidation Trust; and (f) such other responsibilities as may be vested in the Liquidation Trustee pursuant to the Liquidation Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Liquidation Trust.

34

The powers of the Liquidation Trustee are set forth in full in the Liquidation Trust Agreement and shall include, among other things, the right, without any further approval from the Bankruptcy Court, to: (a) sell, lease, license, abandon or otherwise dispose of all Liquidation Trust Assets subject to the terms of the Plan; (b) invest the Liquidation Trust Assets in short term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as treasury bills, and withdraw funds of the Liquidation Trust for that purpose; (c) employ Persons to assist the Liquidation Trustee or the Debtor Representative in carrying out his duties under the Plan and Liquidation Trust Agreement; (d) pay from the Liquidation Trust Assets all obligations of the Liquidation Trust and all costs and expenses of administering the Liquidation Trust and Liquidation Trust Assets, including fees and expenses of the Liquidation Trustee, the Debtor Representative, and Persons employed by the Liquidation Trustee or the Debtor Representative in carrying out his duties under the Plan and Liquidation Trust Agreement, taxes, and other obligations of the Liquidation Trust; (e) implement the Plan, including by making distributions pursuant to the Plan; (f) evaluate and determine strategy with respect to the Liquidation Trust Assets, and prosecute, compromise, release, abandon and/or settle or otherwise resolve any Liquidation Trust Assets, including any and all Avoidance Actions, Causes of Action, or other claims of the Debtors or their Estates; (g) liquidate any Liquidation Trust Assets and provide for distributions therefrom in accordance with the provisions of the Plan; (h) otherwise administer the Liquidation Trust; (i) participate in any post-Effective Date motions to amend or modify the Plan or the Liquidation Trust Agreement, or appeals from the Confirmation Order; (j) participate in actions to enforce or interpret the Plan; (k) bind the Liquidation Trust; (l) administer the Wind-Down Amounts Reserve in order to pay any remaining Wind-Down Amounts pursuant to the terms of the Plan; (m) continue any motions, defenses, or appeals initiated by the Debtors or the Committee prior to the Effective Date relating to any Liquidation Trust Asset; (n) exercise such other powers and authority as may be vested in or assumed by the Liquidation Trustee by any Final Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Liquidation Trust; (o) dissolve the Liquidation Trust in accordance with Section 7.9 of the Plan; and (p) administer the closure of the Chapter 11 Cases.

6       Compensation of the Liquidation Trustee

In addition to reimbursement for actual out-of-pocket expenses incurred by the Liquidation Trustee, the Liquidation Trustee shall be entitled to receive reasonable compensation for services rendered on behalf of the Liquidation Trust on terms to be set forth in the Liquidation Trust Agreement. All such compensation and reimbursement shall be paid from the Liquidation Trust using Liquidation Trust Assets and their proceeds. Like terms shall apply to the fees and expenses of the Debtor Representative.

7       Retention of Professionals by the Liquidation Trustee

As set forth in the Plan and the Liquidation Trust Agreement, the Liquidation Trustee may, without further order of the Bankruptcy Court, employ various Persons on behalf of the Liquidation Trust and Debtor Representative, including, but not limited to, attorneys, consultants and financial advisors, as needed to assist him/her in fulfilling his/her obligations under the Liquidation Trust Agreement and the Plan, and on whatever fee arrangement he/she

deems appropriate, including, without limitation, contingency fee arrangements. For the avoidance of doubt, the Liquidation Trustee may retain professionals who represented parties in interest in the Chapter 11 Cases. Professionals engaged by the Liquidation Trustee shall not be required to file applications with the Bankruptcy Court in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. All such compensation and reimbursement shall be paid from the Liquidation Trust with Liquidation Trust Assets.

        8        Non-certificated Liquidation Trust Interests

The beneficial interests in the Liquidation Trust shall not be certificated, except as otherwise provided in the Liquidation Trust Agreement.

        9        Dissolution of the Liquidation Trust

The Liquidation Trustee and the Liquidation Trust shall be discharged or dissolved, as the case may be, at such time as (i) all assets of the Liquidation Trust have been liquidated and (ii) all distributions required to be made by the Liquidation Trustee under the Plan have been made, but in no event shall the Liquidation Trust be dissolved later than five (5) years from the Effective Date; provided, however, that the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidation Trust for a finite period if (i) such extension is necessary to the purpose of the Liquidation Trust, (ii) the Liquidation Trustee receives an opinion of counsel or a ruling from the IRS stating that such extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes, and (iii) such extension is obtained within the six (6) month period prior to the Liquidation Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable. Upon dissolution of the Liquidation Trust, any remaining Cash on hand and other assets, with the exception of any Causes of Action will be distributed to the Liquidation Trust Beneficiaries in accordance with the Liquidation Trust Agreement. Upon the dissolution of the Liquidation Trust, all remaining Causes of Action shall be deemed void and abandoned and no Liquidation Trust Beneficiary shall have any right, title or interest in or to any such Cause of Action.

        10        Securities Exempt

The issuance of any beneficial interests of the Liquidation Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration.

F.      <u>Limitation of Liability</u>

Neither the Liquidation Trustee will be liable for any act he may do or omit to do as Liquidation Trustee under the Plan and the Liquidation Trust Agreement, as applicable, while acting in good faith and in the exercise of his reasonable business judgment.

36

IX.

**CONFIRMATION AND CONSUMMATION PROCEDURES**

A.   <u>Overview</u>

     A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a liquidation of the debtor's assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of impaired Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.

     If all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. Section 1129(a) sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible." The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the holders of claims or equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the bankruptcy court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization. The Debtors believe that the Plan satisfies all applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the best interests of creditors' test and the feasibility requirement.

     The Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a chapter 11 plan for the bankruptcy court to determine that the class has accepted the plan. Rather, a class of creditors will be determined to have accepted the plan if the bankruptcy court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class. Similarly, a class of equity security holders will have accepted the plan if the bankruptcy court determines that the plan has been accepted by holders of two-thirds of the number of shares actually voting in such class.

     In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. A class is "impaired" if the legal, equitable or contractual rights associated with the claims or equity

37

interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity on the effective date of the plan. Class 1 is not impaired under the Plan, and the holders of Claims in such class are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan. Classes 2, 3, 4A, 4B, 5, 6A and 6B are impaired under the Plan, and the holders of Claims in such classes are entitled to vote to accept or reject the Plan. Class 7 are impaired and will not receive or retain any property under the Plan, and the holders of Claims and Equity Interests in such classes are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

The bankruptcy court also may confirm a chapter 11 plan even though fewer than all of the classes of impaired claims and equity interests accept such plan. For a chapter 11 plan to be confirmed despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property from the estate, unless the senior class receives property having a value equal to the full amount of its allowed claims.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interest in such class.

The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting classes of Claims and Equity Interests.

B.    Confirmation of the Plan

    1    Elements of Section 1129 of the Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied.

Such conditions include the following:

38

a. The Plan complies with the applicable provisions of the Bankruptcy Code.

b. The Debtors have complied with the applicable provisions of the Bankruptcy Code.

c. The Plan has been proposed in good faith and not by any means proscribed by law.

d. Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

e. The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors or a successor to the Debtors under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

f. With respect to each impaired class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Equity Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

g. In the event that the Debtors do not seek to confirm the Plan non- consensually, each class of Claims or Equity Interests entitled to vote has either accepted the Plan or is not impaired under the Plan.

h. Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full, in Cash, on the Effective Date and Tax Claims will be paid in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the allowed amount of such Tax Claims.

i. At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

j. Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any other successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

k. All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

The Debtors and the Committee believe that the Plan will satisfy all the statutory provisions of chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all of the provisions of the Bankruptcy Code, and that the Plan is being proposed and submitted to the Bankruptcy Court in good faith.

2       Acceptance

A class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims actually voting. Each class of Equity Interests will have accepted the Plan if the Plan is accepted with reference to a class of Equity Interests, by at least two-thirds in amount of the Allowed Equity Interests of each class of Equity Interests actually voting.

3      Best Interests of Creditors Test

With respect to each impaired class of holders of Claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtors were liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtors in a chapter 7 liquidation case. The proceeds that would be available for satisfaction of impaired Claims against and Equity Interests in the Debtors would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtors and the cash held by the Debtors at the time of the commencement of the liquidation case. Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 cases. Whereas the Liquidation Trustee and its counsel has the background and familiarity with the remaining assets to be liquidated to realize the most money for the costs to be incurred to complete the process, a chapter 7 trustee and the persons it employs would need time to develop the necessary industry and debtor specific knowledge necessary to assist the chapter 7 trustee examine and distribute the Debtors' assets. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtors during the pendency of the Chapter 11 Cases.

The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from the pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay impaired Claims arising on or in addition to the foregoing, it is expected that the liquidation of remaining assets, under chapter 7 of the Bankruptcy Code would yield less value due to the expeditious liquidation as required by chapter 7 than they are expected to yield under the Plan.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Debtors (net of the amounts attributable to the aforesaid claims) is then compared with the present value offered to such classes of Claims and Equity Interests under the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including (i) the additional costs associated with the appointment of the chapter 7 trustee and (ii) the erosion in value of assets in chapter 7 cases, in the context of the expeditious liquidation required under chapter 7, the Debtors have determined that confirmation of the Plan will provide each holder of an impaired Claim with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code. A liquidation analysis is attached hereto as Schedule I. Section VIII (c.) of this Disclosure Statement is an estimated recovery for Unsecured Creditors under the Plan.

4    Feasibility

The Bankruptcy Code conditions confirmation of a chapter 11 plan on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtors have analyzed the Liquidation Trustee's capacity to service its obligations under the Plan. Based upon their analysis, the Debtors submit that the Liquidation Trustee will be able to make all payments required to be made under the Plan, and that NewCo will be able to meet its obligations under the Plan. Financial Projections for NewCo are attached hereto as Schedule II.

C.    Cramdown

In the event that any impaired class does not accept the Plan, the Debtors nevertheless may move for confirmation of the Plan. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such classes and any other classes of Claims that vote to reject the Plan.

1    No Unfair Discrimination

A chapter 11 plan "does not discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its Claims or Equity Interests.

41

The Debtors and the Committee believe that under the Plan all impaired classes of Claims and Equity Interests are treated in a manner that is consistent with the treatment of other classes of Claims and Equity Interests that are similarly situated, if any, and no class of Claims or Equity Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and Allowed Equity Interests in such class. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired class of Claims or Equity Interests.

2  Fair and Equitable Test

The Bankruptcy Code establishes different "fair and equitable" tests for classes of secured claims, unsecured claims and equity interests as follows:

(a)  Secured Claims.  Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

(b)  Unsecured Claims.  Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

(c)  Equity Interests.  Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (A) the fixed liquidation preference or redemption price, if any, of such stock or (B) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

D.  <u>Effect of Confirmation</u>

Under section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder voted to accept the plan. Further, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors and equity security holders, except as otherwise provided in the plan or the confirmation order.

# X.
## TAX ISSUES

For federal income tax purposes, (i) all parties (including, without limitation, the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) shall treat the Liquidation Trust as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 684, (ii) the transfer of Assets of the Debtors to the Liquidation Trust under the Plan shall be treated as a deemed transfer to the Liquidation Trust Beneficiaries in satisfaction of their Claims followed by a deemed transfer of the Assets by the Liquidation Trust Beneficiaries to the Liquidation Trust, (iii) the Liquidation Trust Beneficiaries will be deemed to be the grantors and owners of the Liquidation Trust and its assets, and (iv) the Liquidation Trust will be taxed as a grantor trust within the meaning of sections 671-677 of the Internal Revenue Code owned by the Liquidation Trust Beneficiaries. The Liquidation Trust will file federal income tax returns as a grantor trust under Internal Revenue Code section 671 and Treasury Regulation section 1.671-4 and report, but not pay tax on, the Liquidation Trust's tax items of income, gain, loss deductions and credits ("Tax Items"). The Liquidation Trust Beneficiaries will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability. All parties will use consistent valuations of the Assets transferred to the Liquidation Trust for all federal income tax purposes. The Assets shall be valued based on the Liquidation Trustee's good faith determination of their fair market value.

The Liquidation Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the LT Reserve(s) as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the LT Reserve(s), with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims), and (iii) distribute assets from the LT Reserve(s) as, when, and to the extent, such Disputed Claims either become Allowed or are otherwise resolved. The Liquidation Trust Beneficiaries shall be bound by such election, if made by the Liquidation Trustee, in consultation with the Oversight Committee, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

For federal and applicable state income tax purposes, all parties (including, without limitation, the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) shall treat the transfers of Assets to the Liquidation Trust in accordance with the terms of the Plan as a sale by the Debtors and/or their Estates of such Assets to the Liquidation Trust at a selling price equal to the fair market value of such Assets on the date of transfer. The Liquidation Trust shall be treated as the owner of all Assets that it holds.

For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest and other fees, premiums and charges, as

applicable.

In connection with the Plan, the Debtors and the Liquidation Trustee, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution. The Liquidation Trustee has the right to withhold a Plan Distribution until such holder has made arrangements satisfactory to the Liquidation Trustee for payment of any such tax obligations. The Liquidation Trustee has the right to withhold a Plan distribution until the holder of the Claim upon which distribution is to be made provides the Liquidation Trustee with IRS Form W-9 and any other information determined by the Liquidation Trustee to be necessary or appropriate to effect information reporting and the withholding of taxes. If the Liquidation Trustee has not received IRS Form W-9 or other requested tax reporting information from the holder of a Claim before the relevant Plan Distribution Date, any property or Cash to be distributed pursuant to the Plan shall, pending receipt of IRS Form W-9 or such other requested information, be treated as an unclaimed distribution under the Plan, as set forth in Section 9.3.2 of the Plan.

NewCo will be taxed as a partnership. NewCo will make distributions to equity to cover their tax liabilities resulting from ownership of NewCo.

THE FOREGOING HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

## XI.
## RISK FACTORS

There are many risks and uncertainties in respect of the Plan and its implementation. The holders of Claims against the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement, before deciding whether to vote to accept or reject the Plan. The risk factors identified below they should not be regarded as the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.  Certain Bankruptcy Considerations

1    Parties in Interest May Object to the Plan's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an

44

interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors and the Committee believe that the classification of Claims against and Equity Interests in the Debtors under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2  Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors and the Committee intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims or Allowed Equity Interests as those proposed in the Plan.

3  The Debtors May Not Be Able Secure Confirmation or Consummation of the Plan

The Plan requires the acceptance of a requisite number of holders of Claims that are entitled to vote on the Plan, and the approval of the Bankruptcy Court, as described in the section of this Disclosure Statement entitled "Confirmation and Consummation Procedures – Overview." There can be no assurance that such acceptances and approvals will be obtained and therefore, that the Plan will be confirmed. In addition, confirmation of the Plan and the occurrence of the Effective Date of the Plan are subject to the satisfaction of certain conditions precedent. Although the Debtors and the Committee believe that the conditions precedent to the confirmation of the Plan and to the occurrence of the Effective Date of the Plan will be met, there can be no assurance that all such conditions precedent will be satisfied. If any condition precedent is not satisfied or waived pursuant to the Plan, the Plan may not be confirmed or the Effective Date may not occur.

Furthermore, although the Debtors believe that the Plan will be confirmed and the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will occur. Further, and notwithstanding the foregoing or anything in the Plan to the contrary, the Debtors have reserved their rights pursuant to the Plan to (in consultation with the Committee) delay the occurrence of the Effective Date with respect to one or more of the Debtors' Estates to a later date; provided, however, that any such election by the Debtors to delay the occurrence of the Effective Date with respect to one Estate shall not prevent the occurrence of the Effective Date with respect to any of the other Estates. If the Plan is not confirmed or the Effective Date does not occur, there can be no assurance that any alternative chapter 11 plan would be on terms as favorable to the holders of Claims and Equity Interests as the terms of the Plan. In addition, if a protracted reorganization or liquidation were to occur, there is a substantial risk that holders of Claims and Equity Interests would receive less than they would receive under the Plan. A liquidation analysis prepared by the Debtors with the assistance of their advisors is attached hereto as Schedule I.

If the Plan is not confirmed and does not go effective for any reason and the Debtors or some other party in interest decide to prosecute a different plan, recoveries to holders of Claims against or Equity Interests in the Debtors may be negatively impacted. If the Plan is confirmed but the Effective Date does not occur, it may become necessary to amend the Plan to provide for alternative treatment of Claims and Equity Interests. There can be no assurance that any such alternative treatment would be on terms as favorable to the holders of Claims and Equity Interests as the treatment provided under the Plan. If any modifications to the Plan are materially adverse to any holders of Claims or Equity Interests, it would be necessary to resolicit votes from holders of such Claims or Equity Interests, which would, at the very least, further delay confirmation and consummation of the Plan, and could jeopardize the consummation of the Plan.

B.      Certain Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan. Holders of Claims and Equity Interests, and other interested parties, should read carefully the discussion set forth in the article of this Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences" for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

XII.
ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have concluded that the Plan will maximize recoveries to holders of Claims and Equity Interests. If no plan of reorganization can be confirmed, the Chapter 11 Cases of the Debtors may be converted to cases under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because (i) the chapter 7 trustee's unfamiliarity with the Debtor and its industry would lead to additional costs for the Estates and (ii) in a liquidation of the Debtors under chapter 11, the Causes of Action retained by the Estates likely will be pursued in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, potentially resulting in greater recoveries. Accordingly, the Debtors have determined that confirmation of the Plan will likely provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7.

XIII.
CONCLUSION

The Debtors believe that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims in the Debtors to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Respectfully submitted:

**GOLD, WEEMS, BRUSER, SUES & RUNDELL**
**(A Professional Law Corporation)**

BY:     **/s/ Bradley L. Drell**
        Bradley L. Drell (Bar Roll #24387)
        Heather M. Mathews (Bar Roll # 29967)
        B. Gene Taylor, III (Bar Roll #33407)
        Chelsea M. Tanner (Bar Roll #37890)
        P. O. Box 6118
        Alexandria, LA   71307-6118
        Telephone: (318) 445-6471
        Facsimile:  (318) 445-6476
        E-mail: bdrell@goldweems.com
**ATTORNEYS FOR DEBTORS AND DEBTORS**
**IN POSSESSION: ACADIANA MANAGEMENT**
**GROUP, L.L.C., ET AL.**

47